UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHERINE ANN GALLAGHER,

                Plaintiff,                        Civil Action No. 10-cv-12498

              v.                          District Judge Julian Abele Cook
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [7, 8]**

Plaintiff Katherine Ann Gallagher brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions which are referred to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkts. 3, 9.)

**I. RECOMMENDATION**

I find that the Commissioner committed legal error in failing to adequately discuss opinions of Plaintiff's treating neurologist. Accordingly, I RECOMMEND that the Court GRANT IN PART Plaintiff's Motion for Summary Judgment (Dkt. 7), DENY Defendant's Motion for Summary Judgment (Dkt. 8), and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

Plaintiff filed this suit on June 23, 2010, alleging that she became unable to work on October 3, 2005. (Tr. 83.) The Commissioner disapproved her claim on July 20, 2006. (Tr. 51-54.) Plaintiff then filed a timely request for a hearing, and on July 25, 2008, Administrative Law Judge ("ALJ") E. James Gildea held a video hearing from Chicago, Illinois. (Tr. 10, 12, 65.) Plaintiff, along with counsel, made her appearance from Michigan. (Tr. 12.) In a decision dated September 3, 2008, the ALJ found that Plaintiff was not disabled. (Tr. 43-50.) The ALJ's decision became the final decision of the Commissioner on April 23, 2010, when the Appeals Council denied Plaintiff's request for review. (Tr. 1.)

### B. Background

Plaintiff was 52 years old at the time of the ALJ's decision. (Tr. 49, 83.)[1] She graduated high school and attended college for two years. (Tr. 15, 113.) From 1976 to 2005, Plaintiff worked at General Motors Power Train ("GMPT") in Flint, Michigan. (Tr. 109.) She spent a number of those years as a shipping and receiving clerk where she frequently had to lift 50 pounds or more. (Tr. 109.)

#### 1. Plaintiff's Testimony

At the hearing, Plaintiff recounted symptoms and limitations related to her carpal tunnel syndrome and cervical radiculopathy. Plaintiff testified that her carpal tunnel causes her "hands [to] go[] numb all the time," prevents her from coloring with her granddaughter, and limits her ability

---

[1]*See* 20 C.F.R. § 404.1563(d) ("If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.").

to go grocery shopping and cook.  (Tr. 19.)  She explained that she must use two hands to lift a gallon of milk or otherwise she would drop it, and that she had difficulty opening lids and jars. (Tr. 27.)  She also said that she had difficulty with buttons and jewelry clasps, and that her hand goes numb when she attempts to blow dry her hair because of "the rotation of your hand."  (Tr. 28.)

Plaintiff also told the ALJ that if she stands for "fifteen, twenty minutes" her "neck starts to hurt and [her] arms start to hurt."  (Tr. 27.)  She testified that she suffers from headaches which she attributed to a combination of her carpal tunnel and a herniated disc in her neck.  (Tr. 20.)

Plaintiff said that she does do some household activities such as laundry and "a little bit" of ironing, but is unable to vacuum because she "can't push [a vacuum because] it's too heavy." (Tr. 21.)  She takes a couple of naps during the day, and sleeps eights hours at night.  (Tr. 20-21.) At the time of the hearing, Plaintiff took care of her four-year old granddaughter two days a week, and "sometimes" on the weekends.  (Tr. 20, 23.)  She also stated that she volunteered as an usher at her church.  (Tr. 20, 22.)

### 2. Medical Evidence

Plaintiff's medical records come from four main sources.  First, Plaintiff saw Dr. Orestes Iung, who appears to have been Plaintiff's general treating physician, from at least December 2003 to June 2006.  (Tr. 209.)  Second, the Transcript includes Plaintiff's medical records from GMPT Flint North Health Services ("GMPT Health") from 2004 through October 2005.  (Tr. 140-79.) Third, Dr. Jeffrey Levin treated Plaintiff at Mid-Michigan Neurology from July 2005 to at least March 2007.  (Tr. 198, 270.)  Dr. Levin also completed a Medical Source Statement regarding Plaintiff's functional limitations on July 14, 2008.  (Tr. 271.)  Fourth, on behalf of Disability Determination Service for Social Security Claims ("DDS"), Plaintiff had a consultative exam with

3

Dr. Neil Friedman on July 18, 2006.

In December 2003, Plaintiff visited Dr. Iung regarding a migraine headache. (Tr. 209.) Dr. Iung noted a "history" of migraine headaches. (Tr. 209.)[2] Indeed, notes from an April 2007 visit with a dentist provide that Plaintiff "started to have migraine headaches in her 20s." (Tr. 277.) April 2004, May 2005, and May 2006 notes from Dr. Iung also note "frequent, severe headaches and migraines." (Tr. 206-08.)

A February 2004 assessment at GMPT Health provides that Plaintiff's "upper extremities" and "hands" were "normal." (Tr. 142.) On June 7, 2005, Plaintiff tripped over a metal plate on the floor in her work area and used her hands to break her fall. (Tr. 152.) X-rays revealed that Plaintiff had sprained both her wrists. (Tr. 153.) GMPT Health advised Plaintiff to use a cold pack on her wrists, and gave her an elastic wrist splint. (Tr. 154.)

On August 30, 2005, Plaintiff saw Dr. Alan Elnick at GMPT Health for hand and wrist pain. Dr. Elnick's notes from that visit provide,

> (S)ubjective SOAP Comments
>
> [The employee] complains of progressively worsening hand and wrist numbness and tingling. She states that she has been gradually worsening from her condition as she had complained of several years ago. She denies any recent injuries or incidences that she can attribute the worsening to be due to, [sic] however she does note that she believes the case is due primarily due [sic] to the computer usage and typewriter that she does on the job. She is a crib attendant. She does handle parts loading and unloading trucks, mostly light to medium weight items. She notes that she is on the computer typewriter probably three hours out of the eight hour day, however, not at any one prolonged period. . . .

---

[2]Dr. Iung also noted that Plaintiff had significant weight loss (107 pounds) after Plaintiff underwent bariatric surgery. (Tr. 208-09.)

(O)bjective SOAP Comments

On evaluation, no change in physical exam.  Employee has good range of motion of wrist and fingers.  Good grip.  She does have a positive Tinel's and Phalen's.[3]  No numbness or tingling is noted at the present time.

(A)ssessment SOAP Comments

Hand numbness and tingling.  Clinically carpal tunnel condition is likely as had been noted previously.

(Tr. 166.)

Starting in July 2005, Plaintiff began to see Dr. Jeffrey Levin at Mid-Michigan Neurology.  Dr. Levin's report from a July 20, 2005, visit states that Plaintiff had "positive Tinel's and Phalen's sign at both wrists," and "thenar[4] weakness and atrophy bilaterally," but that Plaintiff had "no other obvious weakness" in her upper extremities.  (Tr. 198.)  Dr. Levin's impression was "[b]ilateral carpal tunnel syndrome."  (Tr. 198.)

On August 2, 2005, Dr. Levin performed an EMG on Plaintiff.  The accompanying notes

---

[3]Physicians can use various tests to reproduce the symptoms of carpal tunnel syndrome:
In the Tinel test, the doctor taps on or presses on the median nerve in the patient's wrist. The test is positive when tingling in the fingers or a resultant shock-like sensation occurs. The Phalen, or wrist-flexion, test involves having the patient hold his or her forearms upright by pointing the fingers down and pressing the backs of the hands together. The presence of carpal tunnel syndrome is suggested if one or more symptoms, such as tingling or increasing numbness, is felt in the fingers within 1 minute.
National Institute of Neurological Disorders and Stroke (National Institutes of Health), *Carpal Tunnel Syndrome Fact Sheet*, http://www.ninds.nih.gov/disorders/carpal_tunnel/ detail_carpal_tunnel.htm (Dec. 28, 2010).

[4]Stedman's Medical Dictionary (*Stedman's*) (27th ed. 2000) (defining "thenar" as a "[t]erm applied to any structure in relation with the base of the thumb or its underlying collective components.").

5

provide that Plaintiff had "chronic denervation"[5] in the "biceps bilaterally," and "acute denervation" in her "triceps bilaterally." (Tr. 197.) The impression was bilateral carpal tunnel syndrome and "C6-7 radiculopathy[6] right greater than left with acute denervation seen at the C7 level." (Tr. 197.)

On August 31, 2005, Dr. Paul Lauber reviewed an MRI of Plaintiff's cervical spine. His report provides,

> The intervertebral disc space heights . . . are normal aside from some minor narrowing of the C6-C7 disc. At the C6-C7 level, there is a moderate-sized right paracentral disc protrusion, which stops short of the anterior aspect of the spinal cord, but may be just touching the exiting right nerve root. All of the other levels are normal. The cervical cord has a normal appearance with no internal signal alterations. No other significant findings are seen.

(Tr. 139.)

Plaintiff continued to see Dr. Levin through the remainder of 2005 and into 2006. In September 2005, Dr. Levin reviewed the August MRI with Plaintiff and noted that she "may benefit from aggressive physical therapy." (Tr. 196.) In October 2005, Dr. Levin noted that "[i]mpressions have been carpal tunnel syndrome and cervical radiculopathy." (Tr. 195.) The October exam revealed "positive Tinel's and Phalen's signs at both wrist," "thenar weakness and atrophy," and "mild weakness of the triceps bilaterally." (Tr. 195.) At that exam, Plaintiff also complained of headaches for which Dr. Levin prescribed Topamax. (Tr. 195.) In January 2006, Dr. Levin noted

---

[5]*Stedman's* (defining "denervation" as a "loss of nerve supply").

[6]*Stedman's* (defining "radiculopathy" as "[d]isorder of the spinal nerve roots."); *see also* American Academy of Orthopaedic Surgeons, *Cervical Radiculopathy (Pinched Nerve)*, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (Feb. 2010) ("Some people have neck pain that may radiate into the shoulder and arm. This type of pain is often caused by an injury near the root of a spinal nerve. A nerve root injury is sometimes referred to as a 'pinched' nerve. The medical term for this condition is cervical radiculopathy.").

that Plaintiff continued to have positive Tinel and Phalen's signs, thenar weakness, and "mild weakness of the triceps." (Tr. 194.) He also noted persisting "[c]ervical paraspinal muscle spasm." (Tr. 194.) Dr. Levin prescribed an increased dosage of Topamax. (*Id.*) Plaintiff's March 2006 exam with Dr. Levin was similar to the prior exams—her Tinel and Phalen's signs remained positive and there was weakness of Plaintiff's triceps bilaterally and "cervical paraspinal muscle spasm." (Tr. 193.) Dr. Levin noted that Plaintiff would continue on her medicine and that he would "see her back in six month intervals." (Tr. 193.)

In May 2006, Plaintiff returned to Dr. Iung for a yearly physical exam. As relevant here, Dr. Iung noted that Plaintiff "has severe pain in her neck when she turns. She has been seeing a neurologist. He put her on Topamax for her headaches. She also had a MRI of the neck and is thinking about having surgery. She has terrific pain, headache type in the neck and head." (Tr. 206.)

On July 18, 2006, Plaintiff had a consultative medical exam with DDS physician, Dr. Neil Friedman. Regarding Plaintiff's cervical spine, Dr. Friedman found,

> Active cervical range of motion is full in all planes. Ms. Gallagher reports a pulling discomfort, localized to the left posterior and lateral cervical muscles on full lateral flexion to the left only. Active shoulder range of motion is minimally decreased [10 degrees] in adduction, extension and internal rotation. . . . Upper extremity range of motion is otherwise full and reportedly pain free.

(Tr. 258.) He also found that Plaintiff's Hoffmann's sign[7] was "minimally positive bilaterally." (Tr. 258.) Dr. Friedman reported that Plaintiff's grip strength, as measured on a handheld

---

[7]*Stedman's* (defining "Hoffmann sign" as "1. in latent tetany mild mechanical stimulation of the trigeminal nerve causes severe pain; 2. flexion of the terminal phalanx of the thumb and of the second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked.").

dynamometer, ranged from 22 to 26 pounds on the right and 25 to 41 pounds on the left. (Tr. 258.) Further, Plaintiff printed her name legibly and had "no difficulty" picking up a paperclip from Dr. Friedman's hand with either her left or right hand. (Tr. 258.) Dr. Friedman also reviewed Plaintiff's August 2005 cervical MRI, and medical reports from late 2005 to early 2006 from Dr. Levin. (Tr. 259.)

The next day, July 19, 2006, William Lockhart, a medical consultant, completed a Physical Residual Functional Capacity Assessment ("RFC Assessment"). (Tr. 262-68.) The form provides that Plaintiff can occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours in an eight-hour workday, and engage in "unlimited" pushing or pulling. (Tr. 263.) The RFC Assessment further provides that Plaintiff had a manipulative limitation of "fingering," i.e., fine manipulation. (Tr. 265.)

On March 28, 2007, Plaintiff returned for a visit with Dr. Levin. (Tr. 270.) Dr. Levin's accompanying notes are similar to those from her prior visits: she had positive Tinel's and Phalen's on both wrists, thenar weakness, weakness in her triceps, and "[c]ervical paraspinal muscle spasms," with "no other weakness noted." (*Id.*) Levin's impressions were carpal tunnel syndrome, cervical radiculopathy, and chronic daily headaches. (*Id.*)

On July 14, 2008, Dr. Levin completed a Medical Source Statement. (Tr. 271.) Contrary to the form prepared by Lockhart, Dr. Levin's form provides that Plaintiff could only lift or carry less than 10 pounds "for not more" than one-third of an eight-hour workday, stand or walk for a total of two hours per eight-hour workday, and had "severe" push/pull limitations in her right and left upper and lower extremities. (*Id.*)

### 3. Vocational Expert's Testimony

8

The ALJ asked the vocational expert (VE) a hypothetical question regarding the existence of jobs for a person of Plaintiff's age, education, and past work experience with the functional capacity to perform "at the medium exertional level that does not require [the person] to perform frequent handling and fingering." (Tr. 31.) The VE testified that such a person could perform Plaintiff's past relevant work. (Tr. 32.) The VE further stated that if the hypothetical was changed from "medium" to "light" exertional work, there would be 10,000 shipping and receiving clerk jobs in Michigan that the hypothetical person could perform. (*Id.*)

The ALJ then limited the hypothetical individual further, asking the VE if there would be jobs if "the hypothetical individual were restricted to lifting no more than 10 pounds occasionally, less than 10 pounds frequently; standing or walking up to six hours out of an eight-hour day with normal breaks," with no more than frequent handling, fingering, and reaching. (Tr. 32.) The VE answered affirmatively, testifying that there would be at least 12,000 cashier, 2,000 usher, and 4,000 self-service sales association positions in Michigan. (Tr. 33.) Finally, the ALJ asked if there would be jobs if the hypothetical individual was further limited to "occasional" handling and fingering. The VE responded that hypothetical individual could still perform the usher position. (*Id.*)

On cross, Plaintiff's counsel asked the VE about work absences—the VE responded that for an unskilled position, missing a day of work per month for several months would put the employee in "serious trouble with their employers." (Tr. 34.) The VE also testified that if an employee needed to lie down or nap outside of the standard work breaks, that would preclude employment. (*Id.*)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those

who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines

"disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are

denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments

that "significantly limits . . . physical or mental ability to do basic work activities," benefits

are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe

impairment that is expected to last for at least twelve months, and the severe impairment

meets or equals one of the impairments listed in the regulations, the claimant is conclusively

presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied

without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other

work exists in the national economy that plaintiff can perform, in view of his or her age,

education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

10

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.

1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since

October 3, 2005—Plaintiff's alleged onset date.  (Tr. 45.) At step two, the ALJ found that Plaintiff

had the following severe impairments: "bilateral carpal tunnel syndrome" and "cervical

radiculopathy."  (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in

combination, met or medically equaled a listed impairment.  (*Id.*)  Between steps three and four, the

ALJ determined that Plaintiff had the residual functional capacity to

> perform medium work as defined in 20 CFR 404.1567(c) with some
> limitations.  Specifically, the claimant retains the residual functional
> capacity to lift, carry push and/or pull 50 pounds occasionally and 25
> pounds frequently; stand and/or walk for 6 hours in an 8-hour
> workday; and sit for 6 hours in an 8-hour workday.  The claimant is
> limited to no more than frequent reaching, handling and fingering.
> The claimant has no postural, visual, communicative or
> environmental limitations.

(Tr. 46.)  At step four, the ALJ found that Plaintiff could perform past relevant work as a shipping

and receiving clerk.  (Tr. 49.)  Finally, at step five, the ALJ concluded that even if Plaintiff could

not perform her past relevant work, she could perform a significant number of jobs available in the

national economy, including, cashier, usher, and sales attendant.  (Tr. 49-50.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must

11

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human*

12

*Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### F. Analysis

#### 1. Substantial Evidence Supports the ALJ's Step Three Determination

At step three the ALJ found that "the medical evidence does not satisfy the criteria of Listing 1.04. Specifically the record is devoid of evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis with accompanying ineffective ambulation." (Tr. 46.) Plaintiff asserts that the ALJ reached this conclusion in error. Plaintiff also argues that the ALJ erred at step three by failing to have an agency-approved physician determine whether her impairments medically equaled those in Listing 1.04A. The Court disagrees with both points of error.

Listing 1.04A provides:

> Disorders of the spine . . . resulting in compromise of a nerve root . . . . [w]ith [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, 1.04. Restated, for Plaintiff to have been found disabled at step three, she must have had (1) a spinal disorder that (2) result[ed] in "compromise of a nerve root" with (3) "neuro-anatomic distribution of pain," (4) "limitation of motion of the spine," and (5) motor

loss (muscle weakness) accompanied by (6) sensory or reflex loss.[8]  *See id.*

It is well-settled that to "meet" a listing, a claimant's impairments must satisfy each and every element of the listing.  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").  Plaintiff concedes that her medical evidence is inadequate to satisfy two of the Listing 1.04A elements: limited spinal motion and sensory or reflex loss.  (Pl.'s Mot. at 8 ("The only elements missing from the medical records are limitation in motion and sensory or reflex loss. However, [Plaintiff's] medical records support four of the six elements needed for Listing 1.04.").) Further, the Court has reviewed the Transcript in its entirety, and finds no evidence that Plaintiff's spinal motion is limited or that she has sensory or reflex loss.[9]  Accordingly, Plaintiff does not "meet" Listing 1.04A and the ALJ's conclusion on that point is supported by substantial evidence.

Plaintiff nonetheless asserts that "while she may not meet the listing because each of the elements is not present, there is substantial evidence in the record to support an equalization of Listing 1.04."  (Pl.'s Mot. at 9.)  Although "meet" and "medically equal" are separate means of establishing disability at step three, *see* 20 C.F.R. § 404.1525(c)(5), Plaintiff's statement is not

_____

[8]There is no "involvement with the lower back" in this case as Plaintiff has been diagnosed with cervical radiculopathy.

[9]In fact, as the Commissioner aptly notes, Plaintiff's treating neurologist found that Plaintiff's "[d]eep tendon reflexes appear to be normal," (Tr. 198), and the DDS examiner found that Plaintiff's "[a]ctive cervical range of motion is full in all planes," (Tr. 258).

14

supported in law or fact. As to the former, the issue is not whether there is substantial evidence to support an equalization of a listing, but whether substantial evidence supports the ALJ's decision that Plaintiff's impairments are not medically equal to the listing. *See Cutlip*, 25 F.3d at 286.

As to the latter, it is Plaintiff's "burden to prove that he has an impairment or combination of impairments . . . medically equal to one listed in, 20 C.F.R. Pt. 404, Subpt, P, App. 1. To do so, [s]he must . . . present medical evidence that describes how her impairment is equivalent to a listed impairment." *Lusk v. Comm'r Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004). This means that a claimant must present medical findings showing symptoms or diagnoses equal in severity and duration "to *all* the criteria for the one most similar listed impairment.'" *Daniels v. Comm'r Soc. Sec.*, 70 F. App'x 868, 874 (6th Cir. 2003) (quoting *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)); *see also* 20 C.F.R. § 404.1526(a) ("Your impairment(s) is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment."); 20 C.F.R. § 404.1529 ("In considering whether your symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether your symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria.").

Plaintiff failed to provide the ALJ with evidence indicating that the symptoms from her impairments were equal in severity and duration to those in Listing 1.04A. Plaintiff relies on a series of office-visit summaries from her treating neurologist, Dr. Levin. (Pl.'s Mot. at 8.) Dr. Levin's notes for each visit are similar: they recount Plaintiff's positive Tinel and Phalen's signs, her cervical radiculopathy, the weakness in her triceps, and her "cervical paraspinal muscle spasm." (Tr. 193-99, 270.) Even granting that the latter three findings are relevant to the spinal impairment

15

detailed in Listing 1.04A, it remains that Dr. Levin's notes are not "medical evidence that describes *how* her impairment is equivalent to a listed impairment." *See Lusk*, 106 F. App'x at 411 (emphasis added). Nor has Plaintiff herself made any attempt at demonstrating equivalency between Dr. Levin's diagnoses and the elements in Listing 1.04A. Instead, Plaintiff seeks to shift her burden to the Court: she asks the Court to find some way to align Dr. Levin's diagnoses with those elements in Listing 1.04A and determine that the ALJ erred in his equivalency determination. This is without legal basis. *See Lusk*, 106 F. App'x at 411. Accordingly, Plaintiff did not carry her burden of producing evidence that establishes that her impairments are medically equal to a listed impairment, and substantial evidence supports the ALJ's equivalency determination. *Cf. Lusk*, 106 F. App'x at 411 ("Substantial evidence exists to support a finding that the claimant does not meet the listing if there is a lack of evidence indicating the existence of all of the requirements of a listed impairment."); *King v. Heckler*, 742 F.2d 968, 973-74 (6th Cir. 1984) (holding that a lack of evidence to support the required elements of a listing provided substantial evidence that the claimant was not disabled).

Finally, Plaintiff's claim, without citation to legal authroity, that "an equalization determination is something that has to be made by an agency approved physician" is without merit. This argument was recently raised and rejected in this District:

> [T]he ALJ did not err in making the determination of whether Plaintiff's impairments meet or equal a Listing without a medical consultant. . . . Section 404.1526(e) clearly states that "[f]or cases at the Administrative Law Judge or Appeals Council level, *the responsibility for deciding medical equivalence rests with the Administrative Law Judge* or Appeals Council." 20 C.F.R. § 404.1526(e). . . . 20 C.F.R. section 404.906 allows special procedures to test modifications to the disability determination process . . . . In Michigan [this special process involves using] a single decisionmaker . . . . 71 Fed. Reg. 45890-01, 2006 WL

16

> 2283653 . . . . In the "single decisionmaker model" the
> "decisionmaker will make the disability determination after any
> appropriate consultation with a medical or psychological consultant."
> 20 C.F.R. § 404.906(b)(2). *The decisionmaker is not required to do*
> *so in the instance of alleged impairments that are physical in*
> *nature. Id.*

*Timm v. Comm'r of Soc. Sec.*, No. 10-10594, 2011 WL 846059, at *4 (E.D. Mich. Feb. 14, 2011)

*adopted by* 2011 WL 845950 (E.D. Mich. March 8, 2011) (emphases added). This analysis from

*Timm* is an accurate statement of the law and applies squarely to this case. Accordingly, "the ALJ

did not err in making the disability determination without a medical consultant." *See Timm*, 2011

WL 846059, at *4.

### 2. The ALJ's Failure to Discuss Dr. Levin's Medical Source Statement and Medical Records Warrants Remand

Plaintiff asserts that the ALJ erred by failing to "mention or discuss" her treating

neurologist's medical records and opinions. More specifically, Plaintiff refers to Dr. Levin's office-

visit notes from mid-2005 through March 2007, and the Medical Source Statement he completed on

behalf of Plaintiff on July 14, 2008. (*See* Pl.'s Mot. at 7-8, 11.)[10] The Court agrees with Plaintiff

that the ALJ erred by failing to discuss Dr. Levin's records and opinions.

### (a) Dr. Levin's Medical Source Statement Should Be Considered by the Court

As an initial matter, the Court will address the Commissioner's argument that the Court

cannot consider Dr. Levin's Medical Source Statement  Statement because it was not evidence

before the ALJ at the time the ALJ rendered his decision. (Def.'s Mot. at 19-20.) Defendant is

correct that a reviewing court may not look outside the record before the ALJ when reviewing the

---

[10]Despite that the issue was raised by Plaintiff (Pl.'s Mot. at 8), the Commissioner did not argue that Dr. Levin, who treated Plaintiff for nearly two years, is not a treating physician (*see* Def.'s Mot. at 16-20).

correctness of an ALJ's decision. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007) ("Only evidence in the record below can be considered [by the court] when determining whether or not the ALJ's opinion was supported by substantial evidence . . . ."); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."). However, this rule does not apply in this case. The copy of the Medical Source Statement in the Transcript includes a fax date-stamp of July 19, 2008—several days before the hearing with the ALJ. (Tr. 271.) At the July 25, 2008, hearing before the ALJ, Plaintiff's counsel asked the ALJ "did you get the fax July 19th that came in? I know it didn't get on the disc that we have but did you have it?" (Tr. 36.) The ALJ then stated that he had "received something from . . . Dr. Levin . . . sent by you [Plaintiff's counsel] on the 19th of July. Yes." (Tr. 37.) Because the only reasonable inference is that the July 19th fax referenced at the hearing is the July 19th fax that includes Dr. Levin's Medical Source Statement, the Court concludes that it was part of the evidence before the ALJ at the time of his decision. Indeed, even assuming the ALJ had closed the administrative record at the hearing, he was in receipt of the Medical Source Statement prior to that time.

> *(b) The ALJ Failed to Comply with the Procedural Requirements of the Treating Physician Rule*

Generally, greater deference is given to the opinions of a treating physician than to those of a non-treating physician; this is commonly known as the treating physician rule. *See* SSR 96-2p;

18

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).[11]  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not inconsistent with the other substantial evidence in [the] case record.'"   *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)).  And where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source."  *Id.*; 20 C.F.R. §§  416.927, 404.1527.

More important for purposes of this case is that 20 C.F.R. § 404.1527(d)(2) (and § 416.927) "contain[] a clear procedural requirement."  *Wilson*, 378 F.3d at 544.  In particular, "the [ALJ's] decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188 at *5; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  This procedural requirement is justified on two grounds.  First, the

---

[11]The rational behind this rule is that:

> [treating physicians] are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a [claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§  416.927(d)(2), 404.1527(d)(2).

explanation "let[s] claimants understand the disposition of their cases, particularly where a claimant knows that his physician has deemed him disabled and therefore might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (internal quotation marks omitted). Second, the explanatory requirement "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*

An ALJ's failure to comply with the procedural, explanatory component of the treating physician rule is typically not harmless error. "A court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. '[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway.'" *Wilson*, 378 F.3d at 546. Restated, "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The Sixth Circuit has, however, indicated that there are certain, narrow exceptions to the notion that a violation of the procedural aspect of the treating physician rule is not harmless error. In *Wilson*, the Court of Appeals found none of three possible exceptions applicable to the facts before it, but also explained,

> That is not to say that a violation of the procedural requirement of § 1527(d)(2) could never constitute harmless error. We do not decide the question of whether a *de minimis* violation may qualify as harmless error. For instance, if a treating source's opinion is so

> patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal. . . . There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant.  Or perhaps a situation could arise where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation.

378 F.3d at 547.  Thus, the Court will consider, in turn, whether (1) the Medical Source Statement completed by Dr. Levin is "so patently deficient" that the ALJ would not possibly credit it on remand, (2) the ALJ adopted the opinion of Dr. Levin or made findings consistent with his opinion, and (3) whether the ALJ has otherwise satisfied the purposes behind the explanatory safeguard.

Although argued in a different context, the Commissioner's fundamental assertion is that the Medical Source Statement completed by Dr. Levin on July 14, 2008, is weak evidence of Plaintiff's functional limitations.  (*See* Def.'s Mot. at 20.)  It is a checkbox form unaccompanied by a written analysis from Dr. Levin.  (*See* Tr. 271.)  The "Diagnosis" portion of the form contains a cryptic "78031" instead of noting Plaintiff's carpal tunnel syndrome, cervical radiculopathy, and headaches. (*Id.*)  Further, the form provides that in terms of "push/pull" limitations, Plaintiff was *severely* limited in both her right and left *lower* extremities.  (*Id.*)  This conclusion is odd given that Dr. Levin's March 2007 notes provide that Plaintiff is able to "ambulate without difficulties," and, in January and March 2006, he remarked that "[t]here is no weakness noted in [Plaintiff's] lower extremities." (Tr. 193-94, 270.)

But the fact that certain portions of Dr. Levin's Medical Source Statement appear to be unsupported by the record does not necessarily render the ALJ's failure to discuss Dr. Levin's

21

opinion harmless.  On this point, *Stokes v. Comm'r. of Soc. Sec.* is instructive.  No. 09-12722, 2010 WL 4063886 (E.D. Mich. July 23, 2010) *report adopted over objections by* 2010 WL 4063744 (E.D. Mich. Oct. 14, 2010).  In *Stokes*, the ALJ did not discuss a Medical Source Statement by Dr. Ballard, the plaintiff's treating physician, who diagnosed the plaintiff with bipolar disorder and "organic mental disorder."  *Id.* at *9-10.  The Commissioner argued that the ALJ's failure to address the statement was harmless error under the "patently deficient" exception because Dr. Ballard had, contrary to evidence in the record, checked a box indicating that the plaintiff had no problem with alcohol.  *Id.*  The magistrate judge disagreed.  *Id.* at *9-10.  In particular, the magistrate judge found that although Dr. Ballard's own notes reflected that he had recognized the plaintiff's alcohol use and treatment, "this alone is not sufficient reason for the Court to find that [the Medical Source Statement] could not be credited in any respect."  *Id.* at *10.  Because the Medical Source Statement's diagnoses of bipolar disorder was consistent with the doctor's earlier diagnosis, the ALJ did not commit harmless error in failing to discuss the opinion.  *Id.* at *10-11.  The district court, over the Commissioner's objections, agreed:

> The magistrate judge concluded that although Dr. Ballard's opinion may not be weighty, could be subject to criticism or impeachment, and could be contradicted by other medical evidence, it certainly was worthy of consideration and deserved to be reviewed. Moreover, since Dr. Ballard is a treating source, failure to give reasons for disregarding his opinions on disability is error.  In his objections, the defendant maintains that the error is harmless for the same reasons stated in his motion for summary judgment.  The Court is not persuaded by the defendant's objections.

*Stokes v. Comm'r of Soc. Sec.*, No. 09-12722, 2010 WL 4063744, at *2-3 (E.D. Mich. Oct. 14, 2010).

Like the Court in *Stokes*, this Court cannot say that Dr. Levin's Medical Source Statement,

while questionable in part, is "so patently deficient" that the ALJ "could not *possibly*" give it some weight on remand. *See Wilson*, 378 F.3d at 547 (emphasis added). Plaintiff's EMG revealed "chronic denervation" in the "biceps bilaterally," and "acute denervation" in her "triceps bilaterally." (Tr. 197.) Plaintiff's MRI showed "moderate-sized right paracentral disc protrusion, which stops short of the anterior aspect of the spinal cord, but may be just touching the exiting right nerve root." (Tr. 139.) Dr. Levin found that Plaintiff had positive Tinel's and Phalen's signs at both wrists. (Tr. 193-95, 198, 270.) Dr. Elnick at GMPT Health also found positive Tinel's and Phalen's. (Tr. 166.) Moreover, even the DDS consulting physician found that Plaintiff's Hoffmann's sign was "minimally positive bilaterally." (Tr. 258.) Dr. Levin also found that Plaintiff suffered from "chronic daily headaches," and prescribed—and then increased—her prescription for Topamax. (Tr. 194-95.) Dr. Iung similarly noted that Plaintiff suffered from "frequent, severe headaches and migraines." (Tr. 206-08.) The ALJ himself found that Plaintiff's carpal tunnel and cervical radiculopathy were "severe impairments."[12] (Tr. 45.) In light of the foregoing medical evidence, it is plausible that the ALJ could credit, if even only to a limited extent, at least the following parts of the Medical Source Statement: that Plaintiff could lift less than 10 pounds "occasionally" or "frequently," was limited to standing and walking for a total of two hours in an eight-hour day, and could sit for less than six hours in an eight-hour day. (Tr. 271.) For instance, the latter two limitations may be attributable to Plaintiff's documented chronic headaches and cervical radiculopathy.

The conclusion that the Medical Source Statement is not patently deficient is buttressed by

_____

[12] *See* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

the notion that there could be other reasons, beyond the medical evidence, for the ALJ to give some credence to Dr. Levin's opinion on remand. In particular, Dr. Levin is a specialist in Neurology,[13] treated Plaintiff for nearly two years, (Tr. 198, 270), and saw Plaintiff on multiple occasions during that period, (Tr. 193-99, 270). *See* 20 C.F.R. § 404.1527(d) (listing length of treatment, nature and extent of treatment relationship, and specialization as factors that an ALJ considers in deciding the weight to give a medical opinion that is entitled to less than controlling weight); *Wilson*, 378 F.3d at 544. Given Dr. Levin's expertise and his relationship with Plaintiff, he may have had reasonable bases for checking the boxes that he did.

The second exception outlined in *Wilson* is also inapplicable in this case. The ALJ's RFC limited Plaintiff to lifting, carrying, pushing, or pulling 50 pounds occasionally and 25 pounds frequently; standing or walking for six hours per eight-hour workday, and sitting for six hours during an eight-hour workday. (Tr. 46.) Each of these limitations is less restrictive than the corresponding limitations in the Medical Source Statement. (*Compare* Tr. 46 *with* Tr. 271.) Accordingly, the ALJ did not adopt the opinion of Dr. Levin or make findings consistent with his opinion.[14]

---

[13]Dr. Levin's letterhead states that he is board certified in adult and child neurology, and that he is a member of Fellow of the American Academy of Neurology. (Tr. 270.)

[14]Although not argued by the Commissioner, I note that the ALJ's successively narrowing hypotheticals to the VE do not alter my conclusion. During examination of the VE, the ALJ made the hypothetical individual progressively more limited through a series of questions. (Tr. 31-33.) Ultimately, the ALJ asked the VE whether jobs would be available to a hypothetical individual who was restricted to lifting no more than 10 pounds occasionally and less than 10 pounds frequently, standing or walking up to six hours out of an eight-hour day with normal breaks, with no more than frequent handling, fingering, and reaching. (Tr. 32.) The VE answered affirmatively, and stated that there were a total of 18,000 jobs in the regional economy. (Tr. 33.) Although the ALJ's 10-pound limitations are similar (but still slightly less restrictive) to those provided by Dr. Levin, the sitting, standing, walking restrictions are not in accord with Dr. Levin's Medical Source Statement. Thus,

Finally, the Court cannot say that the ALJ, while failing to comply with the letter of the procedural explanatory requirement, satisfied its underlying purpose.  While acknowledging Plaintiff's carpal tunnel syndrome and cervical radiculopathy, and the EMG and MRI supporting these diagnoses, the ALJ never explicitly mentions Dr. Levin, his speciality, Plaintiff's two-year treatment history with Dr. Levin, or Dr. Levin's Medical Source Statement, and, critically, what weight he accorded Dr. Levin's opinion (if any).  In fact, the ALJ stated: "As for the opinion evidence, the undersigned notes that the record does not include any opinions of treating or examining physicians indicating that the claimant is precluded from undertaking work activities." (Tr. 48.)  Under these circumstances, the ALJ has not satisfied the purpose for the procedural requirement: explaining to claimants why their treating physician's opinion was rejected, and providing a written record that allows a reviewing court to determine that the ALJ correctly applied the treating physician rule.  *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 748 (6th Cir. 2007) ("We first note that the ALJ's adoption in this case of an assessment contrary to [plaintiff's treating] opinion—without even addressing [the treating physician's] involvement—transgressed § 1527(d)(2) beyond even the violations in [our prior precedents on this issue] where the treating source was at least mentioned.  This fact alone counsels strongly in favor of a remand."); *Stokes*, 2010 WL 4063744, at *3 ("As the magistrate judge ably explained, the violation of the rule requiring consideration of the opinions of a treating source and an explanation for rejecting them is not *de minimis*, particularly when the ALJ failed even to mention [the treating physician].").

In sum, this is not one of the rare cases where the ALJ's failure to comply with the

---

the ALJ did not incorporate the findings in the Medical Source Statement through his hypotheticals to the VE.

procedural requirements set forth in 20 C.F.R. § 404.1527(d)(2) was harmless, and the Court should not hesitate to remand this case to the Commissioner.  *See Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) ("We have stated that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'"); *Wilson*, 378 F.3d at 546 ("[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway."  (internal quotation marks omitted)).

### G.  Conclusion

For the forgoing reasons, this Court finds that the substantial evidence supports the ALJ's step three determination, but that the ALJ committed procedural error in failing to discuss treating source opinions in his narrative.  Accordingly, the Court should GRANT IN PART Plaintiff's Motion for Summary Judgment (Dkt. 7), DENY Defendant's Motion for Summary Judgment (Dkt. 8), and REMAND the decision of the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the Commissioner should discuss Dr. Levin's medical opinions, including the omitted Medical Source Statement, and, if deemed necessary, reevaluate Plaintiff's RFC, and perform new step four and step five determinations.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/ Laurie J. Michelson
 LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: March 29, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 29, 2011.

s/Susan Jefferson
Deputy Clerk

27